GORBATY, Judge.
hln this appeal, defendants Metal Works of New Orleans, L.L.C., GBII, L.L.C., 1021 Development, L.L.C., Glade B. Bilby, II, James V. St. Raymond, and Thomas J. Long (collectively, “Metal”) appeal the trial court’s granting of plaintiff’s motion for partial summary judgment seeking specific performance. For the reasons set forth below, we affirm.

FACTS AND PROCEDURAL HISTORY

Metal purchased two properties in the Warehouse District, diagonally across the *752 street from each other at 1020 and 1031 Annunciation Street for $1.1 million. Metal wanted to develop the two properties into an attractive, unique apartment or condominium development. The plaintiff, Park Properties, L.L.C. (“Park”) has particular skill and expertise in the planning, design, financing, construction, and management of multifamily apartment and condominium projects.
Metal and Park entered into a written Agreement for Joint Venture. The object of the Agreement was to develop and construct a 121-unit apartment or condominium complex on the Annunciation Street sites. Metal agreed to ^contribute the real estate that composes the project site, and Park agreed to manage all aspects of the project’s development and operation.
The Agreement contemplated funding of the Project through the Federal Housing Administration’s Section 221(d)(4) multifamily mortgage insurance program, which is administered by the United States Department of Housing and Urban Development (“HUD”). It was Park’s obligation under the Agreement to act as the project’s sponsor during the pre-application stage of the Section 221(d)(4) program. Successful completion of that stage meant receiving an invitation from HUD to apply for a “firm commitment” for mortgage insurance.
During the pre-application stage of the Section 221(d)(4) program, Park also was responsible for working with legal counsel on various organizational matters concerning the project, developing the project’s conceptual architectural plans and specifications, securing local zoning and regulatory approval for the project, and beginning the process of retaining a general contractor for the project.
Upon receiving the invitation from HUD, Park and Metal were required under the Agreement to organize a limited liability company that would purchase the project site from Metal, mortgage it to secure financing, and construct the complex. The parties agreed that Park would generally represent the new company, which would be named Metal Works Property Partners, L.L.C., in all aspects of the planning, development, construction, leasing, and operation of the project.
IsWhen the parties entered into the Agreement, they included an estimate of what it would cost to construct a 121-unit complex on the project site, and that estimate was attached as Exhibit A to the Agreement. Section 7 provided that either party could withdraw before the project’s completion if it took longer than eighteen months to obtain financing or the project’s actual costs or equity requirements exceeded the estimate set forth in Exhibit A:
7.1 The occurrence of any of the following events shall authorize either Ap-pearer to recede from this Agreement or withdraw as a Member of the Company without penalty except for the payment by the withdrawing Member of any amounts which may be owed by the withdrawing member in connection with this agreement as of the date of the withdrawal, to wit:
[[Image here]]
7.1.3 In the event the total cumulative development costs of the Project exceeds [sic] the total cost estimate set forth on Exhibit A by fourteen percent (14%) or more.
Park’s compensation for its efforts hinged on the project’s completion; it received no up-front fee. Thus, to protect its investment, Park bargained for the right to purchase Metal’s interest in the project and complete it upon Metal’s withdrawal. *753 Section 8.2 of the Agreement reflects that bargain:
In the event Metal fails to contribute to the Equity or withdraws from the Project for any reason other than failure or refusal to execute the Venture Organization Documents within the Document Execution Deadline (“Metal Withdrawal Event”), Park shall have the right, privilege and option to purchase the Project, including the Project Site and all rights, privileges, servitudes and options related thereto from Metal for the price and on such terms as set forth in the purchase agreement described in Section 3.1.3.
Section 8.2 further provides for the sale of the “Project Site” within 180 days after Metal’s withdrawal at a time and place designated by Park.
Section 3.1.3 sets forth the terms of the sale described in Section 8.2. It provides:
|4Metal is the owner of the Project Site. Metal shall execute a purchase agreement with the Company for the sale of the Project Site for the sum of $1.1 million, payable all cash to the seller at the Initial Closing. In addition to the $1.1 million consideration paid for the Project Site at the Initial Closing, (i) in the event the HUD appraisal used in connection with the Final Closing (“Final Closing Appraisal”) values the Project Site greater than $1.1 million and equal to or less than $1.4 million, then at the Final Closing an amount equal to the difference between $1.1 million and the Final Closing Appraisal shall be paid by the Company to Metal, and (ii) in the event the HUD appraisal used in. connection with the Final Closing (“Final Closing Appraisal”) values the Project Site greater than $1.4 .million, then at the Final Closing $300,000 shall be paid by the Company to Metal and an amount equal to the difference between $1.4 million and the Final Closing Appraisal shall be paid by the Company fifty percent (50%) to Metal and fifty percent (50%) to Park.
Although the Agreement called for a 121-unit complex, and the $14.3 million total development cost estimate that was included in Exhibit A to the Agreement was based on a 121-unit concept, Park determined, after extensive study and consultation with Metal, that constructing 133 units might be more efficient and profitable in the long term. Thus, the parties agreed to explore, and the conceptual plans reflected, a 133-unit complex, which meant adding, another floor of residential units. With this addition, there was an increase in construction costs.
On July 24, 2003, Park principals met with Metal member-managers to discuss the status of the project. At the meeting, Park presented preliminary price estimates from four general contractors. Those initial estimates, which were based on the larger 133-unit design, ranged from $17,596,887 to $19,913,085. Park explained to Metal that it would not select a general contractor until after it had (1) received a second round of price estimates following scheduled meetings with | sthree of the contractors on August 4, 2003, and (2) conducted another round of negotiations in the light of the new estimates.
Four days later, on July 28, 2003, Metal sent Park a letter advising that Metal had elected to terminate the Agreement. Metal based its decision to withdraw from the project entirely on the contractors’ initial estimates and on Section 7.1.3 of the Agreement.
According to Park, Metal’s withdrawal from the project activated Section 8.2 of the Agreement. On September 12, 2003, Park exercised its right and option to purchase the project site and accepted uncon *754 ditionally the terms of the option. Park scheduled the act of sale for January 14, 2004.
Park filed this action in October 2003 to obtain specific performance of Metal’s obligation to sell Park the project site in accordance with Sections 8.2 and 3.1.3 of the parties’ Agreement. The parties filed cross-motions for summary judgment in November 2003. The trial court denied both motions, and the parties proceeded with discovery.
After Park and Metal’s principals gave depositions, the parties filed cross-motions for partial summary judgment on the issue of whether the condition stated in Section 7.1.3 of the parties’ Agreement occurred on or before July 28, 2003. The trial court granted Park’s motion and denied Metal’s motion on November 23, 2004. To clarify procedural issues, Park filed a motion for summary judgment requesting specific performance in accordance with the trial court’s interpretation of the parties’ Agreement. On May 13, 2005, the trial court granted Park’s motion lfifor summary judgment and ordered Metal to appear at an act of sale within sixty days of its judgment. Metal subsequently filed this suspensive appeal.

DISCUSSION

Defendants assert that the trial court erred in concluding that Metal’s exercise of its right to “recede” from the Agreement “without penalty” triggered an option in Section 8.2 of the Agreement allowing Park to purchase Metal’s property for less than fair market value. Section 7.1.3 provides that Metal has the right to withdraw from the agreement “without penalty” if the development costs are too high. Metal basically argues that “without penalty” means without further obligation, liability or adverse consequences, and asserts that the provisions of Section 8.2 do not apply. In other words, according to Metal, its rescission from the Agreement had the effect of terminating the entire Agreement, including Section 8.2, such that the option in Section 8.2 no longer existed when Park purported to exercise it.
A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. Civil Code art.1906. Upon an obligor’s failure to perform an obligation to deliver a thing, or not to do an act, or to execute an instrument, the court shall grant specific performance plus damages for delay if the oblige so demands. La. Civil Code art. 1986. Interpretation of a contract is the determination of the common intent of the parties. La. Civil Code art.2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ 17intent. La. Civil Code art.2046. The words of a contract must be given their generally prevailing meaning. La. Civil Code art.2047.
Metal’s contention that “without penalty” means without obligation or liability finds no support in either prevailing usage or the law. According to Black’s Law Dictionary, a “penalty” is “[a]n extra charge against a party who violates a contractual provision.” Thus, the “without peiialty” language of Section 7.1 means simply that the withdrawing party cannot be required to pay money that it did not already owe on the date of its withdrawal. It does not mean or say that there are no consequences for a withdrawal, or that the remaining party has no rights or remedies. Metal’s further contention that the “without penalty” language confers a right to terminate the Agreement without being further burdened by any of its provisions, including any option in Section 8.2, is also incorrect. The four corners of the Agreement do not support that asserted meaning. Further, Metal’s withdrawal could *755 not and did not render ineffective the provisions of the contract specifically governing withdrawals. If Metal’s interpretation is accepted, Section 8.2 of the contract would be rendered meaningless.
Metal also complains that, by enforcing Section 8.2 as it is written, the trial court unfairly penalized Metal by forcing it to sell the property at a price that is below current market value. However, the terms of the sale and price are set forth specifically in Section 3.1.3, which was agreed to by Metal. This assignment of error is meritless.
| ^Defendants next argue that the trial court erred in failing to conclude that the option in Section 8.2 of the Agreement was not exercisable under its own terms. The express preconditions in Section 8.2 to the exercise of the option were not met. Park wrongly assumes that by terminating the Agreement, Metal withdrew from the Project. The Agreement and the Project are not the same thing. Defendants claim that Metal did not withdraw from the Project, only from the Agreement; as such, the option in Section 8.2 could not be exercised.
The Agreement created and governed the project, and accordingly, Metal could not withdraw from the Agreement without also withdrawing from the Project. Metal acknowledged as much in its July 28, 2003 withdrawal letter, in which it expressly linked termination and withdrawal, and spoke of abandoning the “project” and the “project” not proceeding as planned.
Metal also contends that Section 8.2’s option never arose because “the failure or refusal to execute the Venture Organization Documents” for Metal Works Property Partners, L.L.C., is excepted from the definition of a withdrawal event. This argument is nonsensical. Section 8.1 addresses the failure or refusal to execute the Venture Organization Documents, and, by its own terms; it becomes active “ninety (90) days following the receipt of an invitation to submit for firm commitment from HUD.” The project had not received a HUD invitation before July 28, 2003, which made Section 8.1 inapplicable in determining Park’s rights and remedies upon Metal’s withdrawal. We find no merit to this assignment of error.
IflNext, defendants claim that the trial court erred in failing to conclude that Park did not properly exercise the option in Section 8.2 of the Agreement. Metal accuses Park of conditionally accepting the option under Section 8.2 in contravention of the Louisiana jurisprudence on the issue, contending that Park seeks only to purchase the “Project Site” and not the “Project.”
Park’s September 12, 2003 letter exercising the option provides that “Park unconditionally accepts the terms of the option.” Further, Metal’s efforts to create confusion between the “Project” and “Project Site” fail. The Agreement defines the “Project” as the “acquisition, financing, construction, development, leasing and operation of a multi-family unit apartment and/or condominium complex to be constructed on the Project Site (herein defined) as reflected on the approved plans and specifications.” Thus, the “Project” is the development of the property that composes the “Project Site,” and all architectural plans and specifications for that development were created by Park. As such, there is no additional property that Park could seek to exclude from its purchase right under Section 8.2.
Defendants further assert that the trial court erred in failing to recognize that the option in Section 8.2 was fatally indefinite and therefore unenforceable. First, Metal contends that the option cannot be enforced because it expresses no separate *756 price for “portions of the Project other than the Project Site.” Section 8.2 clearly provides that the sale shall proceed according to the terms set forth in Section 3.1.3 of the Agreement. Moreover, Metal fails to identify a single “portion of the Project” defined in the parties’ Agreement for which a price is omitted.
|inSecond, Metal argues that the Agreement sets forth an indefinite price for the Project Site. However, Section 3.1.3 provides for the sale of the property for the price of $1.1 million. The back-end payment described in the third sentence of Section 3.1.3 is an obligation that could not be owed until after full ownership has transferred to Park; it is not part of the sale price. Thus, there is no doubt about the price that Park must pay at the Act of Sale: $1.1 million.
Metal also suggests that Park will not seek HUD financing, thereby depriving it of Section 3.1.3’s back-end payment. But Park obtained an invitation to apply for HUD financing after Metal withdrew from the Project, and the HUD appraisal would have been completed long ago if not for Metal’s refusal to sell Park the property.
Next, Metal contends that the Agreement is not “sufficiently definite” as to the time within which Section 3.1.3’s back-end payment must be made. In support of that contention, Metal cites cases that concern the payment of the credit portion of a purchase of real estate. These cases do not apply here because there is no credit portion. Section 3.1.3 makes clear that ownership transfers upon the payment of $1.1 million, “payable all cash.” Thus, the timing of the back-end payment has no bearing on the validity of Metal’s obligation to transfer the property.
Fourth, Metal argues that Section 8.2 cannot be enforced because it contemplates a sale to the “Company,” meaning Metal Works Property Partners, L.L.C. This company was never formed due to Metal’s withdrawal, but its nonJbrmationu does not affect the validity of the option. Section 8.2 expressly provides that Park has the right to purchase the project “from Metal.”
Fifth, Metal claims that Section 8.2 is unenforceable for failure to state a time within which the option must be exercised. Section 8.2 expressly provides that the sale must occur, and thus the option must be exercised, within 180 days after Metal’s withdrawal. Metal withdrew on July 28, 2003, and Park exercised its rights on September 12, 2003 — well within the 180-day limit. This assignment of error, including all of its subparts, lacks merit.
In their next assignment of error, defendants argue that the trial court erred in failing to conclude that Park’s prior material breach of the Agreement excused any further performance under the Agreement by Metal. Metal cites Sections 4.2 and 4.6 of the parties’ Agreement in support of its argument. Section 4.2 set forth Park’s obligation to develop architectural plans and specifications, first for the development of the financing package and later for the construction. Section 4.6 provided that Park would communicate with and direct “third party professionals as necessary to accomplish the business plan and financing.”
Park was fulfilling its obligations at the time of Metal’s withdrawal. It had completed the project’s conceptual design work; commissioned third-party reports that were necessary for the project’s financing package; drafted production drawings, plans, and specifications; begun price negotiations with general contractors; and submitted pre-application materials to HUD. Metal’s allegations of breach find no support in the record.
*757 LgMetal also contends that the preliminary construction-cost estimates reviewed before the withdrawal reflected a breach of “implied obligations” or a lack of good faith by Park. However, the scope of the project had changed to a greater number of units after the parties executed the Agreement. Metal consented to exploring the 138-unit design, rather than 121 units, and was fully aware that adding an additional .floor to the development would increase costs. This assignment of error has no merit.
In their final assignment of error, defendants aver that the trial court erred in concluding that there were no material issues of fact preventing the granting of summary judgment in favor of Park. Defendants failed to brief this assignment of error, so under Rule 2-12.4 of the Uniform Rules of Court, it is deemed abandoned. Additionally, a review of the record reveals that there are no material disputed facts in this matter.

CONCLUSION

Accordingly, for the foregoing reasons, the judgment of the trial court granting summary judgment and ordering specific performance is affirmed. Metal must sell the property to Park in accordance with the provisions of Section 3.1.3 ■ of the Agreement.

AFFIRMED.